UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20-cv-00434-RJC-DSC

|  |  |  |
|---|---|---|
| MEDSHIFT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **Order** |
| CHARLES W. MORGAN | ) | |
| PELLE, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**THIS MATTER** is before the Court on Defendants' motion for summary judgment ("Defendants' Motion") (Doc. No. 18) and Plaintiff's partial motion for summary judgment ("Plaintiff's Motion") (Doc. No. 20). For the reasons stated herein, the Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART** and the Plaintiff's Motion is **GRANTED IN PART** and **DENIED IN PART**.

I.     BACKGROUND

A.  Factual Background

1.   The Parties and Device

Defendant Pelle, LLC ("Pelle") is a small medical spa located in Manchester, New Hampshire. (Doc. No. 19-1 ¶ 4). Pelle offers medical grade aesthetic procedures performed under the supervision of a medically licensed professional. (*Id.*; Doc. No. 22 ¶ 5). Defendant Charles W. Morgan is the owner of Pelle ("Morgan") (Pelle and Morgan together, the "Defendants") (Doc. No. 19-1 ¶ 14).

MedShift, LLC is a company that, at least in part, assists with financing medical equipment and marketing for medical spas ("MedShift" or "Plaintiff").[1] (Doc. No. 20-1 ¶ 6). MedShift does not develop or manufacture medical devices. (Doc. No. 20-2 at 41:2-11)). MedShift is not involved in obtaining FDA approval for any medical devices. (*Id.*). Rather, in certain instances, after manufacturers market medical devices to potential clients, the manufacturer contacts MedShift to provide financing to the client for the medical device. (*Id.* at 21:1-22:16).

Lumenis is the manufacturer of the AcuPulse Laser System (the "AcuPulse"), and FemTouch attachment which connects to the AcuPulse to facilitate gynecological uses of the AcuPulse, including vaginal rejuvenation (together with the AcuPulse, the "Device"). (Doc. No. 20-1 ¶ 10; Doc. No. 19-1 ¶ 7). Generally, under MedShift's arrangement with Lumenis, after Lumenis engages with clients about the Device and confirms a sale of the Device, Lumenis contacts MedShift in instances where the client needs alternative financing, such as making monthly payments rather than payment in full upfront. (Doc. No. 20-2 at 21:13-23; Doc. No. 25-3 ¶¶ 9-11). When clients obtain financing through MedShift, MedShift purchases the Device from Lumenis at a discounted rate and delivers it to the customer in exchange for payments from the client for the Device. (Doc. No. 25-3 ¶¶ 11-16).

2. The Agreement

On May 30, 2017, Pelle representatives contacted Lumenis about purchasing the Device. (Doc. No. 19-1 ¶ 7). Lumenis in turn engaged MedShift to assist with financing Pelle's purchase of the Device for $130,000. (Doc. No. 19-1 ¶¶ 8-12; Doc. No. 19-3 at 64). Later that day, Pelle

---

[1] The parties dispute how MedShift characterizes itself (i.e., whether it characterizes itself as a medical equipment financing company, or something more), but for purposes of summary judgment both parties agree MedShift does, in part, assist with financing and provides marketing support in certain instances.

and MedShift representatives discussed entering into a potential agreement for the Device and marketing support specifically related to vaginal rejuvenation. (Doc. No. 19-1 ¶¶ 9-12). Defendants assert vaginal rejuvenation was Pelle's only interest in and purpose for purchasing the Device and that Pelle's representatives informed MedShift employees of its sole purpose before entering into the Agreement. (Doc. No. 19-1 ¶¶ 9-12).

On May 31, 2017, MedShift and Pelle entered into an End User Subscription Agreement (the "Agreement"). (Doc. No. 1-1 at 11-17). Under the terms of the Agreement, MedShift agreed to:

    (1) Deliver and install the Device, with "supporting documentation, analytics data, software, Operative Analytics, and training;"

    (2) Provide the MedShift Operative Analytics Platform which included treatment data, patient feedback, software allowing the Device to communicate with cloud computing infrastructure, and information storage; and

    (3) Provide marketing services, including listing on vConfidence.com website and inclusion in other online campaigns for vaginal health, listing on Manufacturers provider website, and inbound call center services for internet-based leads from vConfidence and other MedShift campaigns.

(*Id.* at 16). In exchange, Pelle agreed to make monthly payments in the amount of $2,495 "within fifteen (15) days of the invoice date." (*Id.* at 17). The Agreement was in force for a fixed term of five years, after which Pelle had the right to purchase the Device for $975. (*Id.* at 11). Morgan signed the Agreement as Guarantor for Pelle. (*Id.* at 15).

Of relevance to this matter, Section 2 of the Agreement provides:

    "**Use of the Products; Restrictions; Remedies; Adverse Patient Event Notification.** . . . (d) [Pelle] agrees and warrants that (i) [Pelle] and each Authorized User will use the Products only for their intended and approved uses and in accordance with all Manufacturer and MedShift documentation, and any updates, revisions, and technical bulletins related thereto."

(*Id.* at 11).

Pursuant to the Section 5 of the Agreement, either party was entitled to terminate the Agreement for "cause." Specifically, the Agreement provides:

> (a) **<u>Termination for Cause</u>**. If either party breaches any provision of this Agreement, then the non-breaching party may give written notice to the breaching party that, if the default is not cured within thirty (30) calendar days after receipt of such notice, this Agreement will automatically terminate. If the non-breaching party gives such notice and such breach is not cured during such thirty (30) calendar day period, then this Agreement shall automatically terminate at the end of such thirty (30) calendar day period.

(*Id.*). Additionally, under the Agreement, either party could terminate the Agreement without cause with 60 days' notice. (*Id.* at 12). If Pelle terminated the Agreement without cause before the end of the five year term of the Agreement, it:

> must pay the termination fee equal to the sum of the remaining and then outstanding monthly subscription fees. If [Pelle] does not pay the amount due to MedShift within fifteen (15) days of the due date [Pelle] agrees to pay all costs, including but without limitation, any court costs, collection agency fees, and reasonable attorneys' fees paid by MedShift to collect the Termination Fee.

(*Id.*). After termination, MedShift had the right to take possession of the Device. (*Id.*).

### 3. Performance of the Agreement

After entering into the Agreement, MedShift purchased the Device directly from Lumenis for $69,900, after which Lumenis had no financial interest in the Agreement. (Doc. No. 19-3 at 67:10-17; Doc. No. 19-3 at 34:18-22). MedShift delivered the Device to Pelle's office. (Doc. No. 19-1 ¶¶ 15-17). Pelle also received from MedShift marketing materials and brochures related to promoting vaginal rejuvenation and "talk tack to help Pelle's staff discuss the vaginal rejuvenation procedure." (Doc. No. 19-1 ¶ 14). Certain of Pelle's employees received training on how to use the Device from Lumenis. (Doc. No. 20 ¶¶ 34-42; Doc. No. 24 ¶ 26).

The parties dispute whether Pelle made full and timely payments pursuant to the Agreement.  According to MedShift, it began invoicing Pelle on June 30, 2017, and each month thereafter between June and September 2017, but Pelle did not make its first payment under the Agreement until October 2, 2017.  (Doc. No. 21 at 5; Doc. No. 20-1 ¶¶ 43-52).  MedShift asserts Pelle was in breach and did not cure its initial breach in payments under the Agreement.  (*Id*.).  On the other hand, according to Defendants, Pelle received its first invoice from MedShift on October 2, 2017, made payment the same day, and Defendants were never informed Pelle was in breach.  (Doc. No. 23-1 ¶¶ 7-17).  Defendants also point to deposition testimony from MedShift's CFO, who stated that in August 2018 Pelle's account was not delinquent.  (Doc. No. 19-4 at 54:22-55:8).  The parties do agree that Pelle's last payment made under the Agreement was on July 24, 2018.  (Doc. No. 20-1 ¶ 55; Doc. No. 24 ¶ 35).

### 4.  The FDA Statement – July 2018

On July 30, 2018, the FDA issued a statement regarding a "growing number of manufacturers marketing 'vaginal rejuvenation' devices to women and claiming these procedures will treat [certain] conditions and symptoms . . . [using] lasers and other energy-based devices to destroy or reshape vaginal tissue."  (Doc. No. 20-1 at 72).  It warned that the "products have serious risks and don't have adequate evidence to support their use for these purposes.  We are deeply concerned women are being harmed" (the "FDA Statement").  (*Id.*).  The FDA Statement noted that the devices were approved for treatment of certain specific serious conditions, but "the safety and effectiveness of these devices hasn't been evaluated or confirmed by the FDA for 'vaginal rejuvenation.'"  (*Id.*).  It warned "women and their healthcare providers that the FDA has serious concerns about the use of these devices to treat gynecological conditions beyond those for which the devices have been approved or cleared."  (Doc. No. 20-1 at 72-73).  It listed seven

manufacturers that the FDA contacted regarding "inappropriate marketing of their devices for 'vaginal rejuvenation,'" none of which were Lumenis, the manufacturer of the relevant Device. (*Id.*).

Lindsay Andronaco, Pelle's medical director ("Andronaco"), began researching the FDA Statement and learned that the Device was not FDA approved for vaginal rejuvenation. (Doc. No. 22 ¶¶ 10-13). She decided she would no longer oversee Pelle's use of the Device based on the FDA Statement and other research she completed, for the safety of its clients. (Doc. No. 19-1 ¶ 18; Doc. No. 22 ¶¶ 10-14). Andronaco claims she has not permitted the use of the Device at Pelle since July 30, 2018. (*Id.* ¶ 21).

### 5. Pelle's Termination Letter – August 2018

On August 28, 2018, Pelle, through counsel, sent a letter to MedShift stating that pursuant to Section 5 of the Agreement, the "correspondence shall constitute a Notice of Default and Termination for Cause" (the "August 2018 Termination Letter"). (Doc. No. 5-1 at 2). The August 2018 Termination Letter stated that Lumenis and MedShift marketed the Device to Pelle "as being appropriate and approved to treat urinary incontinence, vaginal atrophy, vaginal laxity, vaginal dryness, and vaginal rejuvenation." (Doc. No. 5-1 at 2). It relied on Paragraph 2(d) of the Agreement which states, Pelle would use the Device "only for [its] intended and approved uses and in accordance with all Manufacturer and MedShift documentation." (Doc. No. 5-1 at 2; Doc. No. 1-1 at 11). Pelle asserted MedShift breached the Agreement because Pelle could only use the device for "approved" purposes and was "unable to use the Device consistent with the [Agreement] without violating the FDA warning." (Doc. No. 5-1 at 2-3). The August 2018 Termination Letter provided MedShift thirty days to cure its default or "the agreement will automatically terminate" and MedShift could make arrangements to retrieve the Device from Pelle. (Doc. No. 5-1 at 3).

Following the August 2018 Termination Letter, Pelle did not make payments under the Agreement. (Doc. No. 20-1 ¶ 55; Doc. No. 24 ¶ 35). MedShift did not take possession of the Device. (Doc. No. 19-1 ¶ 23; Doc. No. 19-4 at 55:7-9). Afterwards, according to MedShift, it emailed Pelle over 2,000 emails with notice of Pelle's overdue payment status. (Doc. No. 27-1 ¶ 25). Defendants assert these were automated emails largely only sent to an accounting administrator who did not read them. (Doc. No. 26-1 ¶¶ 11-16).

### 6. MedShift's Demand Letter – March 2020

On March 4, 2020, MedShift, through counsel, sent a letter to Pelle, notifying Pelle of its breach, providing 30 days to cure the breach, and demanding payment (the "March 2020 Demand Letter"). (Doc. No. 1-1 at 27-28). It also instructed Pelle to return the Device to MedShift. (*Id.* at 28). The March 2020 Demand Letter stated that Pelle "failed to provide timely payments . . . since July 2018." (*Id.* at 27). Pelle did not make payments under the Agreement to MedShift following the March 2020 Demand Letter and Pelle remains in possession of the Device. (Doc. No. 20-1 ¶ 55; Doc. No. 24 ¶ 35; Doc. No. 19-1 ¶ 23).

### B. Procedural Background

Thereafter, MedShift filed suit in the Superior Court of Mecklenburg County on July 2, 2020, and was removed to this Court on August 7, 2020. (Doc. No. 1-1). The Complaint brings claims for (1) breach of contract; (2) specific performance; and (3) unjust enrichment. (*Id.*). Defendant Morgan filed a motion to dismiss which the Court denied. (Doc. Nos. 11, 15). Defendant Pelle brought counterclaims against MedShift claiming MedShift made false representations that the Device was safe and FDA approved when it was not. (Doc. No. 5). Pelle brings counterclaims for (1) breach of contract; and (2) breach of implied warranty of merchantability. (*Id.*).

Following discovery, MedShift and Defendants filed cross-motions for summary judgment. (Doc. Nos. 18, 20). Defendants' Motion seeks summary judgment on MedShift's claims. Plaintiff's Motion is a motion for partial summary judgment as to liability only on all of its claims and Pelle's counterclaims, but asks for damages to be determined by trial at a later date.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. *Id.* The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citations omitted). "The burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id.* at 249-50.

## III. DISCUSSION

### A. Breach of Contract Claims

Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 530 S.E.2d 838, 845 (N.C. Ct. App. 2000). A valid contract requires offer, acceptance, consideration, and mutuality of assent of terms that are sufficiently definite to enable a court to enforce them. *Triad Packaging, Inc. v. SupplyONE, Inc.*, 925 F. Supp. 2d 774, 789 (W.D.N.C. 2013); *Cole v. Champion Enters.*, 496 F. Supp. 2d 613, 621 (M.D.N.C. 2007). "As a general rule, if either party to a bilateral contract commits a material breach of the contract, the non-breaching party is excused from the obligation to perform further." *McClure Lumber Co. v. Helmsman Constr., Inc.*, 585 S.E.2d 234, 239 (N.C. Ct. App. 2003). A material breach is "one that substantially defeats the purpose of the agreement or goes to the very heart of the agreement, or can be characterized as a substantial failure to perform." *Supplee v. Miller-Motte Bus. Coll., Inc.*, 768 S.E.2d 582, 593 (N.C. Ct. App. 2015). "The question of whether a breach of contract is material is ordinarily a question for a jury." *Id.*

1. July 2017 Breach

MedShift argues it is entitled to summary judgment on its breach of contract claim because Pelle has been in breach of the Agreement since July 15, 2017, when MedShift did not receive payment from Pelle within 15 days after the first invoice dated June 30, 2017. Defendants respond that MedShift's breach of contract claim based on the July 15, 2017 date is barred by the statute of limitations, and even if Pelle did breach on July 15, 2017, then MedShift waived such breach.

The statute of limitations for breach of contract in North Carolina is three years. N.C. Gen. Stat. § 1-52(1). The limitations period begins to run when the cause of action accrues, which for breach of contract is the date of breach. N.C. Gen. Stat. § 1-15; *MacDonald v. Univ. of N.C. at Chapel Hill*, 263 S.Ed.2d 578, 564 (N.C. 1980). Under MedShift's theory of breach of contract, the limitations period would begin accruing on July 15, 2017, the date it alleges the contract was breached. The Complaint was filed on July 2, 2020; thus, it was filed within three years of the cause of action accruing. However, MedShift did not plead its breach of contract claim based on the alleged July 15, 2017 breach. MedShift argues under Federal Rule of Civil Procedure 15(c)(1)(B), the asserted July 15, 2017 breach relates back to the original Complaint. MedShift has not filed a motion for leave to amend the Complaint despite Local Rule 7.1(C)(2). Therefore, the Court need not consider whether, for purposes of these motions, leave to amend the Complaint is appropriate or whether the statute of limitations would relate back to the date of the originally filed Complaint.

Even if the Court did ultimately conclude the MedShift's new theory relates back to the original Complaint, MedShift waived the alleged July 15, 2017 breach. "[T]he parties may waive or excuse non-occurrence of or delay in the performance of a contractual duty." *Dishner*

*Developers, Inc. v. Brown*, 549 S.E.2d 904, 906 (N.C. Ct. App. 2001). As stated by the North

Carolina Supreme Court:

> A waiver is sometimes defined to be an intentional relinquishment of a known right. The act must be voluntary and must indicate an intention or election to dispense with something of value or to forego some advantage which the party waiving it might at his option have insisted upon. The waiver of an agreement or of a stipulation or condition in a contract may be expressed or may arise from the acts and conduct of the party which would naturally and properly give rise to an inference that the party intended to waive the agreement. Where a person with full knowledge of all the essential facts dispenses with the performance of something which he has the right to exact, he therefore waives his rights to later insist upon a performance. A person may expressly dispense with the right by a declaration to that effect, or he may do so with the same result by conduct which naturally and justly leads the other party to believe that he has so dispensed with the right.

*Guerry v. Am. Tr. Co.*, 68 S.E.2d 272, 274 (N.C. 1951). North Carolina courts have reiterated

those principles in more recent decisions. *E.g., Ball v. Maynard*, 645 S.E.2d 890, 897–98 (N.C.

Ct. App. 2007). A party may waive the performance of a contractual duty even when the contract

contains an anti-waiver clause. *42 E., LLC v. D.R. Horton, Inc.*, 722 S.E.2d 1, 7 (N.C. Ct. App.

2012) ("The general view is that a party to a written contract can waive a provision of that contract

by conduct expressly or surrounding performance, despite the existence of a so-called anti-waiver

or failure to enforce clause in the contract. This is based on the view that the nonwaiver clause

itself, like any other term of the contract is subject to waiver by agreement or conduct during

performance." (citation and quotation marks omitted) (quoting *ASC Utah, Inc. v. Wolf Mountain

Resorts, L.C.,* 245 P.3d 184, 196 n.8 (Utah 2010))).

Here, assuming Pelle did breach the Agreement in July 2017, the Court concludes MedShift

waived the breach as a matter of law. Despite MedShift now asserting for the first time that Pelle

breached the Agreement in July 2017, the evidence shows that after July 2017: (1) MedShift

accepted payments from Pelle in the ordinary course until July 2018, when Pelle discontinued

making payments; (2) MedShift never sent a notice of default and right to cure letter to Pelle

pursuant to the terms of the Agreement for the alleged July 2017 breach; (3) even when MedShift did send a notice of default and right to cure, the March 2020 Demand Letter did not reference the July 2017 breach, rather, it stated that "Pelle has failed to provide timely payments pursuant to Section 3 of the Contract since July 2018;" (4) MedShift's Complaint did not reference a breach as of July 2017, but again, focused on the nonpayment after July 2018; and (5) MedShift's CFO testified during a deposition in this matter that in August 2018 Pelle's account was not delinquent. The Court concludes as a matter of law, even assuming Pelle breached the Agreement in July 2017, MedShift waived any such breach. Accordingly, MedShift is not entitled to summary judgment for breach of contract based on the alleged July 2017 breach.

## 2. August 2018 Breach

Defendants argue they are entitled to judgment as a matter of law on MedShift's breach of contract claim, as pled in the Complaint, because (1) Pelle had a good faith basis to assert MedShift breached the Agreement after the FDA Statement was issued, and MedShift's failure to respond to its August 2018 Termination Letter until March 2020 caused the Agreement to terminate for cause based on a plain reading of the Agreement; (2) the claim is barred by laches because MedShift did not respond to Pelle's assertion of breach and termination for cause for 18 months; (3) MedShift cannot prove damages; and (4) MedShift did not mitigate damages. Pelle also brings a counterclaim for breach of contract claiming MedShift failed to provide a Device that could be used for its intended and approved uses as required under the Agreement. MedShift moves for summary judgment on this claim. Both claims involve analysis of similar issues are addressed herein together.

### a. Whether MedShift Breached the Agreement

Under North Carolina law,

> [i]nterpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution. If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract. Intent is derived not from a particular contractual term but from the contract as a whole.

*State v. Philip Morris USA Inc.*, 685 S.E.2d 85, 91 (N.C. 2009) (internal citations and quotation marks omitted). "[W]hen the terms of a contract are plain and unambiguous, there is no room for construction." *Id.* (quotation marks omitted). "A contract that is plain and unambiguous on its face will be interpreted by the court as a matter of law." *Schenkel & Schultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 658 S.E.2d 918, 921 (N.C. 2008). In such a case, the court cannot look beyond the terms of the contract to determine the intentions of the parties. *Lynn v. Lynn*, 689 S.E.2d 198, 205 (N.C. Ct. App. 2010). "When an agreement is ambiguous and the intention of the parties is unclear, however, interpretation of the contract is for the jury." *Schenkel*, 658 S.E.2d at 921, 362 N.C. 269. "A contract term is ambiguous only when, in the opinion of the court, the language of the contract is fairly and reasonably susceptible to either of the constructions for which the parties contend." *Philip Morris USA Inc.*, 363 N.C. at 641 (brackets and quotation marks omitted).

Here, the issue revolves around the interpretation of Section 2(d) of the Agreement, and whether the FDA Statement created "cause" to terminate the Agreement:

> "**Use of the Products; Restrictions; Remedies; Adverse Patient Event Notification.** . . . (d) [Pelle] agrees and warrants that (i) [Pelle] and each Authorized User will use the Products only for their intended and approved uses and in accordance with all Manufacturer and MedShift documentation, and any updates, revisions, and technical bulletins related thereto."

(Doc. No. 1-1 at 11).

Defendants argue Pelle "intended" to use the Device for vaginal rejuvenation and after the FDA Statement it could no longer use the Device for Pelle's "intended" purpose. When reviewing

the clause as a whole, it is plain and unambiguous that the clause placed limitations on Pelle's use of the Device to only use it for the *Device's* intended uses, not *Pelle's* intended uses of the Device. In other words, Pelle interprets the clause narrowly to subjectively read in Pelle's specific intended use of the Device for its specific medical practice. However, the clause is broader and limits the use of the Device only to the Device's objectively intended and approved uses. Interpreting the clause this way makes sense. For example, the clause would not create a breach of contract claim in favor of MedShift if Pelle used the Device for $CO_2$ laser skin resurfacing, a dermatology procedure, in its medical practice. As such, the clause does not create or place any obligations on MedShift to provide a Device that can be used only for Pelle's subjective intended uses. Moreover, the Agreement does not contain any clauses regarding future FDA approval, warnings, or limitations and the effects they would have on the Agreement. Because the Agreement is unambiguous, the Court need not consider any conversations between Pelle and MedShift representatives prior to entering into the Agreement. Therefore, MedShift did not breach the Agreement as a result of the FDA Statement.

> b. *Whether MedShift's Failure to Respond to the August 2018 Termination Letter Automatically Terminated the Agreement For Cause*

Nevertheless, regardless of whether MedShift actually breached the Agreement, relying on Section 5(a), Defendants assert MedShift's failure to respond or object to the August 2018 Termination Letter until March 2020 caused the Agreement to terminate automatically for cause based on a plain reading of the Agreement.

> **Termination for Cause**. If either party breaches any provision of this Agreement, then the non-breaching party may give written notice to the breaching party that, if the default is not cured within thirty (30) calendar days after receipt of such notice, this Agreement will automatically terminate. If the non-breaching party gives such notice and *such breach is not cured during such thirty (30) calendar day period,*

*then this Agreement shall automatically terminate at the end of such thirty (30) calendar day period*.

(Doc. No. 1-1 at 11) (emphasis added).

The plain language of Section 5 of the Agreement automatically terminates the Agreement after 30 days if the asserted breach is not cured, but Defendants' argument ignores a significant word in the clause – "breach" – and reads into the clause "good faith assertion." The clause does not provide that the Agreement automatically terminates based on failure to cure or respond to a party's "good faith assertion" of a breach. Rather, it automatically terminates the Agreement for failure to cure a breach. Since there was no breach here, the Agreement did not automatically terminate when MedShift failed to respond to the August 2018 Termination Letter.

For this argument, Defendants rely on *Waccamaw Bank v. Keystone Builders Res Grp., Inc. (In re Eagle Creek Subdivision, LLC)*, No. 09-00049-8-JRL, 2011 WL 1855869 (Bankr. E.D.N.C. May 7, 2020). In *Waccamaw Bank*, the plaintiff alleged defendant breached a contract when it failed to provide the contractually required notice and cure period before terminating a contract. *Id.* The court first concluded the plaintiff breached the contract, and next, concluded defendant did not breach the contract because it did in fact send a notice and cure letter. Defendants rely on a sentence in the opinion for their position, which states "The record clearly shows that [plaintiff] was fully aware of its right to cure the breach when it received such written notice from [defendant] but took no action to cure the defective performance." This case is distinguishable in a number of ways. Most apparent, in *Waccamaw Bank* the court concluded that the contract was in fact breached, which allowed the contract to be terminated. Here, MedShift did not breach the contract and the termination for cause clause does not apply, under the plain reading of the contract, which explicitly requires a breach. Second, the court did not address whether a failure to respond to a notice to cure letter results in automatic termination of a contract; rather, the court concluded

the contract terminated when the plaintiff failed to cure an actual breach. Accordingly, MedShift's failure to respond to the August 2018 Termination Letter within thirty days did not automatically terminate the Agreement for cause.

### c. Whether MedShift's Breach of Contract Claim is Barred by Laches

Next, Defendants argue MedShift's breach of contract claim is barred by laches because MedShift did not respond to the August 2018 Termination Letter or assert a breach for 18 months. MedShift responds that laches is not an available defense to claims that are legal in nature.

Laches is an affirmative defense "that bars a claim where the lapse of time has resulted in some change in the condition of the property or in the relations of the parties which would make it unjust to permit the prosecution of the claim." *Town of Cameron v. Woodell*, 563 S.E.2d 198, 201 (N.C. Ct. App. 2002) (quotation marks omitted). The party asserting the defense of laches must prove: "(1) the claimant knew of the existence of the grounds for the claim; (2) the delay was unreasonable and must have worked to the disadvantage, injury or prejudice of the party asserting the defense; [and] (3) the delay of time has resulted in some change in the condition of the property or in the relations of the parties." *Id.* "[T]he delay necessary to constitute laches depends upon the facts and circumstances of each case; however, the mere passage of time is insufficient to support a finding of laches." *MMR Holdings, LLC v. City of Charlotte*, 558 S.E.2d 197, 198 (N.C. Ct. App. 2001). When a party acts within the applicable statute of limitations, laches will not apply absent exceptional circumstances. *Carolina First Bank v. Stambaugh*, No. 1:10cv174, 2011 WL 6217409, at *4 (W.D.N.C. Dec. 14, 2011) (citing *Phipps v. Robinson*, 858 F.2d 965, 972 (4th Cir. 1988)).

Under North Carolina law, laches "is not available in an action at law." *Cater v. Barker*, 617 S.E.2d 113, 118 (N.C. Ct. App. 2005) (granting motion for summary judgment on breach of

contract claim and rejecting defendants laches defense because plaintiff's claim was legal in nature not equitable) (citations, quotations, and brackets omitted). When a plaintiff's claims are legal in nature, not equitable in nature, "laches cannot support judgment for the defendant." *Id.*; *Tommy Davis Constr. Inc. v. Cape Fear Public Utility Auth.*, 807 F.3d 62, 68 (4th Cir. 2015) (rejecting defendants' laches defense); *see also Phipps v. Robinson*, 858 F.2d 965, 970-71 (4th Cir. 1988) (applying North Carolina law and concluding the "equitable defense of laches may not be asserted as a defense" to action at law of ejectment).

Here, applying North Carolina law, the defense of laches is not an available defense to MedShift's breach of contract claim, which is an action at law. While Defendants are correct that MedShift also seeks equitable relief in the form of specific performance and, in the alternative, unjust enrichment, Defendants' motion for summary judgment specifically argues that MedShift's breach of contract claim is barred by the doctrine of laches. Thus, this argument is unavailing and Defendants' laches defense fails.[2]

### d. Damages

Defendants also ask the Court to dismiss MedShift's breach of contract claim because it failed to provide documentation supporting its damages calculation. Additionally, Defendants argue MedShift failed to mitigate damages because it did not take possession of and re-lease or re-sell the Device. MedShift responds that the amount of damages, including mitigation of damages,

---

[2] Defendants cite to *High Voltage Bevs. LLC v. Coca-Cola Co.*, for the proposition that courts have applied laches to claims of monetary relief. No. 3:08CV367, 2011 U.S. Dist. LEXIS 21423 (W.D.N.C. Mar. 3, 2011). However, that case involved a trademark infringement suit, not a breach of contract, and did not analyze the issue of whether laches was an appropriate defense to an action at law under North Carolina law. *Id.* The North Carolina Court of Appeals cases discussed above deal specifically with applying the doctrine of laches to breach of contract actions under North Carolina law.

is a question of fact; MedShift's partial motion for summary judgment also asks for damages to be determined at trial.

The party claiming damages bears the burden of proving damages with a reasonable certainty. *Majewski Enterprises, Inc. v. Park at Langston, Inc.*, 711 S.E.2d 454, 460 (N.C. Ct. App. 2011). The reasonable certainty standard "requires something more than hypothetical or speculative forecasts, [but] it does not require absolute certainty." *Id.* (quotation marks omitted). Generally, the amount of damages to be awarded is a question of fact and the proper standard with which to measure those damages is a question of law. *Id.* North Carolina recognizes a failure to mitigate damages as a valid affirmative defense. *Guessford v. Pa. Nat'l Mutual Casualty Ins. Co.*, 983 F. Supp. 2d 652, 667 (M.D.N.C. 2013). "The [breaching] defendants [bear] the burden of proof on [their] affirmative defense that [the nonbreaching party] failed to mitigate its damages." *Clark v. Bichsel*, 767 S.E.2d 145, 148 (N.C. Ct. App. 2015). "The purpose of asserting the affirmative defense of failure to mitigate damages is to introduce 'facts which show that the plaintiff's . . . cause of action does not entitle him to so large an amount as the showing on his side would otherwise justify the jury in allowing him.'" *Guessford*, 983 F. Supp. 2d at 667 (quoting *Scott v. Foppe*, 100 S.E.2d 238, 240-41 (N.C. 1957)).

Here, MedShift has presented sufficient evidence that damages exist based on Defendants' breach to create a question of fact as to the amount. Similarly, it is a question of fact as to whether and to what extent MedShift failed to mitigate damages. Accordingly, the amount of MedShift's damages remains a question of fact for trial.

3. <u>Conclusion</u>

In sum, for the foregoing reasons, on each parties' breach of contract claim the Court concludes: (1) assuming Defendants breached the Agreement in July 2017, MedShift's conduct waived any such breach and it cannot assert a breach of contract claim based on such breach; (2) under the plain language of the Agreement, MedShift did not breach in July 2018 based on the FDA Statement; (3) since MedShift did not breach, the Agreement was not terminated for cause when MedShift failed to respond to the August 2018 Termination Letter; (4) MedShift's breach of contract claim is not barred by laches; (5) since the parties agree Defendants stopped making payments after July 2018 as a result of the FDA Statement, Defendants breached the Agreement when they stopped making payments after July 2018; and (5) questions of fact exist regarding the amount of MedShift's damages.

**B. MedShift's Specific Performance Claim**

MedShift also seeks specific performance, which is a remedy for breach of contract "available to compel a party to do precisely what he ought to have done without being coerced by the court." *Ball v. Maynard*, 645 S.E.2d 890, 896 (N.C. Ct. App. 2007). "The party claiming the right to specific performance must show the existence of a valid contract, its terms, and either full performance on his part or that he is ready, willing and able to perform." *Id.* Specific performance is only available when there has been a breach of contract. *Action Development Corp. v. Woodall*, 205 S.E.2d 592, 595 (N.C. Ct. App. 1974). It "may not be granted where the performance of the contract is impossible and specific performance will not be decreed against a defendant who is unable to comply with the contract even though the inability to perform is caused by the defendant's own act." *Curran v. Barefoot*, 645 S.E.2d 187, 195 (N.C. Ct. App. 2007) (quotation marks omitted).

The Agreement provides in relevant part, "[i]f termination occurs, MedShift or its designee shall have the right to take immediate possession of the [Device]." (Doc. No. 1-1 at 12). Under the terms of the Agreement, MedShift is entitled to take immediate possession of the Device and summary judgment will be granted on MedShift's specific performance claim. The Agreement does not require Defendants to deliver the Device to MedShift; rather, Defendants must make the Device available at Pelle's medical spa for MedShift to arrange to take possession.

### C. MedShift's Unjust Enrichment Claim

Defendants argue they are entitled to summary judgment on MedShift's unjust enrichment claim because an express contract exists between the parties and governs the claim. MedShift brings the unjust enrichment claim as an alternative claim and does not seek double recovery; however, it argues since Defendants raised defenses of fraud, fraud in the inducement, and/or negligent misrepresentation MedShift is entitled to bring an unjust enrichment claim in the alternative.

"The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor." *Krawiec v. Manly*, 811 S.E.2d 542, 551-52 (N.C. 2018). "In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party," and "[t]he benefit must not be gratuitous and it must be measurable." *Id.* An unjust enrichment claim is a claim "in quasi contract or a contract implied in law" . . . which "is not a contract" or "based on a promise" but rather imposed by law to prevent unjust enrichment. *Booe v. Shadrick*, 369 S.E.2d 554, 556 (N.C. 1988). "If there is a contract between the parties the contract governs the claim and the law will not imply a contract." *Id.; Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, No. 02–1425, 2003 WL 21752892, at *920

(4th Cir. 2003) ("An unjust enrichment claim is available only in the absence of an express contract between the parties."); *McManus v. GMRI, Inc.*, No. 3:12–CV–009–DCK, 2012 WL 2577420 (W.D.N.C. 2012) (Keesler, J.) (dismissing unjust enrichment claim because valid and enforceable contract exists between the parties).

Here, the conduct at issue is governed by an express contract between the parties. While Defendants raise defenses that the Agreement is invalid because of alleged misrepresentations made to Defendants by MedShift when entering into the Agreement, the Court finds these defenses unavailing because any alleged false representations, misrepresentations, or concealments made specifically by MedShift were not reasonably or justifiably relied on by Defendants. Prior to entering into the Agreement, Defendants had the opportunity to conduct research into the safety and efficacy of the Device for vaginal rejuvenation, including in the publicly available FDA records.[3] Indeed, that is precisely what Andronaco did after the FDA Statement was issued, and she was able to determine whether she would continue to oversee the use of the Device for vaginal rejuvenation based on such research. Moreover, MedShift is not the manufacturer of the Device, and is not involved in FDA approval of the Device. For these reasons, the Agreement governs the claims and relationships among the parties and MedShift's unjust enrichment claim fails.

---

[3] *See* U.S. Food & Drug Administration, https://www.fda.gov/medical-devices/consumers-medical-devices/are-there-fda-registered-or-fda-certified-medical-devices-how-do-i-know-what-fda-approved (last visited on Feb. 4, 2022) ("The FDA provides several ways for you to check if the FDA approved or cleared a medical device or, as described below, if the FDA authorized the device to be used during a public health emergency.").

**D. Pelle's Counterclaim for Breach of Implied Warranty of Merchantability**

MedShift also seeks summary judgment on Pelle's counterclaim for breach of implied warranty of merchantability because the Agreement expressly disclaims it. Pelle argues summary judgment is not appropriate in instances where the contract may be deemed invalid by fraud or negligent misrepresentation.

Pursuant to N.C. Gen. Stat. § 25-2-316 the implied warranty of merchantability may be disclaimed if the disclaimer specifically mentions "merchantability" and is displayed conspicuously. Whether a disclaimer is conspicuous is a question for the court. N.C. Gen. Stat. § 25-1-201(10). A disclaimer is conspicuous if it is "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it." N.C. Gen. Stat. § 25-1-201(10).

> Conspicuous terms include the following:
>
> a. A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and
>
> b. Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

*Id.*

Here, the Agreement includes the following clause which disclaims "all warranties whether implied or statutory or arising out of custom or course of dealing or usage of or in the trade, including without limitation warranties of merchantability or fitness for a particular purpose . . . ." (Doc. No. 1-1).

16.      **Limitation of Liability.** NOTWITHSTANDING ANY LAW OR CONVENTION WHICH MIGHT OTHERWISE APPLY, MEDSHIFT'S TOTAL AGGREGATE LIABILITY ARISING OUT OF THE SUBJECT MATTER OF THIS AGREEMENT WILL BE LIMITED TO $2,500. EXCEPT FOR THE WARRANTIES EXPRESSLY SET FORTH HEREIN, MEDSHIFT MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, AND EXPRESSLY DISCLAIMS ALL WARRANTIES, WHETHER IMPLIED OR STATUTORY OR ARISING OUT OF CUSTOM OR COURSE OF DEALING OR USAGE OF OR IN THE TRADE, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. UNDER NO

CIRCUMSTANCES WILL MEDSHIFT BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES, INCLUDING DAMAGES FOR LOST DATA, REVENUE, PROFITS OR BUSINESS OPPORTUNITIES, LOSS OF USE, THE COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES OR OTHER FINANCIAL LOSSES. THESE LIMITATIONS APPLY EVEN IF MEDSHIFT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY, AND REGARDLESS OF THE THEORY OF LIABILITY. IN NO EVENT WILL MEDSHIFT BE LIABLE FOR ANY DAMAGES RESULTING FROM MEDSHIFT'S FAILURE TO MEET ANY DELIVERY SCHEDULE.

Pelle agrees the language and conspicuousness of the disclaimer satisfy the requirements of N.C. Gen. Stat. § 25-2-316(2). *See* Doc. No. 23 at 17 ("[A]ppears that MedShift's language of disclaimer in the Agreement meets the code's requirement of conspicuousness and satisfies the requirements for excluding the implied warranties of merchantability and fitness for a particular purpose under N.C.G.S. § 25-2-316(2)."). However, Pelle argues summary judgment is not appropriate here because questions of fact exist regarding its affirmative defenses, including misrepresentations made by MedShift when entering to the Agreement.

As discussed above, the Court finds Defendants' defenses that the Agreement is invalid because of alleged misrepresentations made by MedShift when entering into the Agreement unavailing because any alleged misrepresentations were not reasonably or justifiably relied on. The Agreement satisfies the requirements of N.C. Gen. Stat. § 25-2-316(2) for disclaiming the implied warranty of merchantability. Therefore, the Court concludes the implied warranty of merchantability was disclaimed in the Agreement and Pelle's claim fails.

## IV.   CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1.  Defendants' motion for summary judgment (Doc. No. 18) is **GRANTED IN PART** and **DENIED IN PART**. Specifically, Defendants' motion for summary

judgment is **DENIED** as to Plaintiff's claims for breach of contract and specific performance. Defendants' motion for summary judgment is **GRANTED** as to Plaintiff's claim for unjust enrichment.

2. Plaintiff's partial motion for summary judgment (Doc. No. 20) is **GRANTED IN PART** and **DENIED IN PART**. Specifically, Plaintiff's partial motion for summary judgment is **GRANTED** as to its breach of contract claim for nonpayment after July 2018, specific performance, Defendants' breach of contract counterclaim, and Defendants' breach of implied warranty of merchantability counterclaim. Plaintiff's partial motion for summary judgment is **DENIED** as to its unjust enrichment claim and breach of contract based on a July 2017 breach.

Signed: February 8, 2022

Robert J. Conrad, Jr.
United States District Judge